**In re Vera G. FINKEL, Debtor.**

**Bankruptcy No. 92–51906–C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Jan. 8, 1993.

Martin W. Seidler, San Antonio, TX, for debtor.

Jack R. Bird, Michael S. Held, Lynda L. Lankford, Jenkens & Gilchrist, P.C., Dallas, TX, for Sizzler Restaurants Intern., Inc.

## DECISION ON OBJECTION OF SIZZLER RESTAURANTS INTERNATIONAL TO DEBTOR'S CLAIM OF EXEMPTION

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the objections of Sizzler Restaurants International to the ex-

emptions claimed by the debtor. This decision constitutes the ruling of the court thereon.

## PROCEDURAL BACKGROUND

On June 2, 1992, Debtor, Vera Finkel, filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code. Sizzler Restaurants International, Inc. (Sizzler) holds an unsecured claim in this case. Sizzler objected to Debtor's business homestead exemption claimed on property owned by her and leased to a company (GFAF), in which she holds a 49% ownership interest.[1]

## FACTUAL BACKGROUND

Vera Finkel's late husband, Philip Finkel, founded the San Antonio chain of Sizzler Family Steak House Restaurants in 1968. The company was later incorporated under the name of Finkel Enterprises, Inc., now GFAF. By the 1980's, the stock in the company was held in three equal shares between Philip Finkel and his sons Larry and Ron. Ron later released his shares to Philip and Larry, who then each held 50%. Philip actively participated in the business's operations until the time of his death in 1988, acting as President and Chairman of the Board. Although Philip and Vera Finkel drew no salary from the corporation during Philip's life, they received rental income from land which they owned in their individual capacities, which land was leased to the corporation for two of the restaurant locations.

Vera Finkel never held any stock in her own name. She acquired her ownership interest in the company by devise under her husband's will. In May 1989, she transferred a 1% interest to her son, Larry, giving him 51% controlling interest in the company, in order to relieve her of daily operational decisions that needed immediate attention. Thereafter, Larry functioned as President and Chairman of the Board. Vera continued to hold her 49% interest.

Though she was never particularly active in the restaurant business when her husband was alive, Vera Finkel now claims to work at the corporation's headquarters for several hours a day, four days a week. She describes what she does as observing the operation of the restaurant and reporting any operational deficiencies to an appropriate person, and filing personnel records. More accurately, Vera is always welcome at the restaurant which her son now runs, regularly eats lunch there, helps out with the filing in the office occasionally, and, if she sees something wrong (the salad bar running low, something left dirty), she reports it to the manager then on duty. Vera is currently 76 years old and suffers from high blood pressure.

Vera's son, Ron, began living with her some time after her bankruptcy filing. Ron helps to manage Vera's business affairs, but is not financially or legally dependent on her.

## ANALYSIS

The Texas Constitution gives a Debtor a homestead exemption "... provided, that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the homestead claimant...." TEX.CONST., art. XVI, § 51 (Vernon Supp.1992). This constitutional provision is echoed in the Texas Property Code at Section 41.002. TEX.PROP.CODE, § 41.002 (Vernon Supp.1992).

In 1989, this court held that to claim a business homestead exemption under the Texas Constitution, two conditions must be met. First, the head of the family must have a calling or business to which the property is reasonably adapted and reasonably necessary. Second, the property must be used as a place to exercise the calling or business of the head of the family. *In re Krug,* 102 B.R. 98, 99 (Bankr.W.D.Tex. 1989). The Fifth Circuit recently agreed with this formulation of the issue in its affirmance of another bankruptcy court which had followed *Krug. Matter of Webb,* 954 F.2d 1102, 1108 (5th Cir.1992);

---

1. Sizzler also objected to various other items claimed as exempt, but these objections were resolved by announcements at the time of trial. They are not addressed in this decision.

see also Ford v. Aetna Insurance Co., 424 S.W.2d 612, 616 (Tex.1968). In this case, the central issue is not so much whether the property in question is peculiarly adapted to the business, but rather whether the debtor even *has* a business or calling such that she is entitled to claim a business homestead for its practice.

## I. The business or calling of the debtor required to establish a business homestead

■ In order for there to be a business homestead, there must be a calling or business being exercised on the property. In *Waggener v. Haskell*, the court defined "calling" as "the usual occupation, profession, or employment; [sic] vocation" of a party. The term "business" is "that which busies or occupies one's time, attention, and labor as his chief concern; that which one does for livelihood; occupation; employment." *Waggener v. Haskell*, 89 Tex. 435, 35 S.W. 1, 2 (1896). The terms have been held to embrace every "legitimate avocation by which honest support of a family may be obtained." *C.D. Shamburger Lumber Co. v. Delavan*, 106 S.W.2d 351, 356 (Tex.Civ.App.—Amarillo 1937, writ ref'd).

By the same token, not every activity that generates income constitutes a calling or business. For example, Texas courts have long held that the mere renting of property does not constitute a calling or business sufficient to provide a business homestead exemption. *E.g., B. Duncan v. Woolf*, 380 S.W.2d 862, 868 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e.); *C.D. Shamburger Lumber Co. v. Delavan*, 106 S.W.2d at 357; *Mays v. Mays*, 43 S.W.2d 148, 152 (Tex.Civ.App.—Beaumont 1931, no writ); *Lyon v. Files*, 110 S.W. 999, 1001 (Tex.Civ.App.1908, no writ). Such activity is classified as investment activity rather than a business or calling, because it requires little time and attention and does not comport with the general accepted notions of business. *C.D. Shamburger Lumber Co. v. Delavan*, 106 S.W.2d at 357; *But see, Orr v. Orr*, 226 S.W.2d 172, 175 (Tex. Civ.App.—Amarillo 1949, no writ).

On the other hand, some renting activity could qualify as a business or calling. For example, in *Orr v. Orr* the court ruled that the operation of a tourist camp, which involved the renting of cabins on the claimed property, counted as the operation of a "business" within the definition anticipated by the Texas Constitution because it required much attention and time of the party to maintain the grounds and operations of the facilities. *See Orr v. Orr*, 226 S.W.2d at 175; *see also C.D. Shamburger Lumber Co. v. Delavan*, 106 S.W.2d 351 (Tex.Civ.App.—Amarillo 1937, writ ref'd) (same).

■ In this case, there are but two activities that could conceivably qualify as a business or calling of Vera Finkel. One is the operation of a restaurant on the property. The other is the rental of the property. Insofar as the rental of the property is concerned, the facts here more closely resemble those of *Mays v. Mays* than those of *Orr v. Orr*. There is no "business" associated with Vera's renting this land to the company that runs a restaurant on the premises such as there was in *Orr*, where the debtor ran a tourist camp, a feature of which happened to be the "rental" of units by the day or week. This is more simply the use of the land solely to be rented out to a restaurant, just as the tracts of land in *Mays* were used solely as rental space for tenants.

■ If Vera Finkel has a business or calling which could conceivably qualify this property as her business homestead, then, it would have to be the operation of the restaurant business. Under Texas law, there are two ways in which this property could be business homestead in the hands of Vera Finkel. One, obviously, is that Vera Finkel could be in the restaurant business, using this property for that purpose. The other, less obviously, is that her deceased husband was in the restaurant business, and he could have used this property as *his* business homestead up until his death. In this latter case, Vera Finkel would, as a surviving spouse, enjoy whatever homestead rights her husband had established in the property. *See Evans v.*

*Pace,* 21 Tex.Civ.App. 368, 51 S.W. 1094, 1095 (1899, no writ); *Givens v. Hudson,* 64 Tex. 471 (1885); *Orr v. Orr, supra.*

The facts here do not support the notion that Vera Finkel is currently in the restaurant business. She is not running GFAF, she is not an officer in that corporation, and she does not even own a controlling interest. She is a passive investor in GFAF, and it is GFAF which is in the restaurant business. Her office filing and helpful hints do not constitute a business or calling in their own right, and they certainly do not establish that she is in the restaurant business.

■ However, one could persuasively argue that Vera's husband Philip *did* conduct his business or calling on this property. At the very least, there was no evidence to prove that he did not, and, in Texas, the burden is on the objecting creditor to *disprove* the business homestead. *Federal Petroleum Co. v. Pittman,* 65 S.W.2d 359, 361 (Tex.Civ.App.—Eastland 1933, writ ref'd). At least conceivably, then, Vera Finkel might claim this property as homestead via her rights as a surviving spouse.

*II. The abandonment of a business homestead*

■ Either way, however, Vera Finkel could not maintain her entitlement to the business homestead claim unless she stayed in the business. If she left the business, she will be deemed to have abandoned the business homestead. *Federal Petroleum Co. v. Pittman,* 65 S.W.2d 359, 361 (Tex.Civ.App.—Eastland 1933, writ ref'd); *White v. Yates,* 85 S.W. 46, 48 (Tex. Civ.App.1905, no writ); *Evans v. Pace,* 21 Tex.Civ.App. 368, 51 S.W. 1094, 1095 (1899, no writ). We thus must determine whether Sizzler has proven that Vera Finkel abandoned the business homestead.

■ The *Pittman* court explained that the rules for abandonment of a business homestead and a residential homestead are precisely the same, i.e., the challenging creditor has the burden of proving an actual intent to abandon. *Id.; see Alexander v. Lovitt,* 56 S.W. 685, 686 (Tex.Civ.App. 1900). The factual inquiry is different,

however. With residential homesteads, we look for a voluntary intention to no longer reside on the property, and usually require as one of the subsidiary facts found that another property have been acquired as a new or substitute homestead. *Id.* With business homesteads, we look for facts showing a voluntary discontinuance of the business, i.e., facts which demonstrate a cessation of any further intent to continue the business. The same fact might have no probative force were we speaking of abandonment of a residential homestead, but be of significant probative force in the case of business homesteads. For example, a financial inability to acquire another residence would not necessarily establish a lack of intent to claim a residential homestead, but a financial inability to engage in a business would tend to show a lack of intent to again engage in the business. *Pittman,* 65 S.W.2d at 361.

Both *Evans* and *Yates* confirm that this rule of abandonment applies even when the homestead is claimed via the surviving spouse rules. Both cases involved surviving spouses whose husbands, while alive, had established and operated a business on a given tract. The *Evans* court observed that

[a]t the time of W.J. Evans' death, the business house was exempt. Had he lived, and his wife had died, we think there could be no question as to his right to hold the business house exempt from forced sale *so long as he used it for pursuing his business therein.* The law makes no difference between the husband and wife. So when W.J. Evans died, the business house being exempt, it so descended to her, *and so remained until she failed in business, she having used it for the purpose of conducting a mercantile business from the time her husband died until her failure in business;* and so it remained until she sold it, unless, as a matter of fact, she abandoned it as such after her failure.

*Evans v. Pace,* 51 S.W. at 1095 (emphasis added). The court did not have enough evidence before it to know whether Mrs. Evans had in fact abandoned the property

in question and remanded it for further proceedings.

Similarly, in *Yates*, a partition suit, the court noted that the record as of the trial did not sufficiently demonstrate whether the wife did or did not intend to continue to use the property in question for her business homestead. The court added that

> [i]f she should fail to use it for business purposes within such time as to indicate that she had abandoned the same, and did not intend to use it for such purpose, then the appellant would be entitled to recover their interest, and to have a partition of the same.

*White v. Yates*, 85 S.W. at 48.

In our case, Ms. Finkel decided well before the bankruptcy to get out of the restaurant business (and there is considerable doubt that she was ever in it in the first place).[2] She obviously does not continue to operate the Finkel Restaurant business on the premises as did her late husband. She is not involved in the operation of the Finkel Restaurant business in anything but the most superficial manner, and the business being operated on the premises is not hers but her son's. Ms. Finkel transferred controlling interest in the corporation to her son, expressly to be relieved of daily operations decisions and of the typical duties of conducting a business. No stock was ever issued in Vera Finkel's name, individually. What interest she had in the business she inherited, and she obviously wanted nothing of the responsibilities associated with running the restaurants, preferring to leave those duties to her son. Obviously, Larry Finkel had *de facto* control of operations even before the stock transfer. By transferring a 1% interest to him, his mother gave him unfettered control over the restaurant's operations, while relieving her of having to participate in shareholder meetings in which she had no real interest. Vera Finkel never held a position as an officer, director, or employee of the restaurant operation. Her only real involvement in the business has been her permanent leasing of the property to the corporation and her being a passive investor by virtue of her stock interest.

All of these factors, taken together, establish beyond any serious dispute that Vera Finkel got out of the restaurant business long before the bankruptcy, if she was ever in it to begin with. Under the rule announced in *Pittman* and *Evans*, the facts here establish that Ms. Finkel both abandoned and intended to abandon the business of running Finkel's Restaurants, such that the property in question did not qualify as her business homestead as of the filing of the bankruptcy. Certainly, Vera Finkel, just like the spouse in *Orr v. Orr*, could have picked up her husband's business after his death and run it. But that was clearly not her desire. She wanted her sons to have the business, and to run it. Indeed, the facts make it apparent that Philip had always intended that the business pass on to his sons—hence the shared stock interest. Vera simply fulfilled what had apparently always been hers and her husband's intentions—that the restaurant operation go to the boys, and that she would just collect the rent they paid and always be welcome for lunch.[3]

### III. The family unit question and the rights of surviving constituent family members to claim a business homestead

■ Though not directly argued, the facts presented suggest that the debtor might contend that the property qualifies

---

2. Recall that it was her husband, Philip, who started the restaurant business. Long before he died, he was already in the process of passing the business on to his sons, though he and his wife kept the real property on which two of the restaurants sat. By the time Philip died, the restaurant business was essentially Larry Finkel's, with his mother's role limited essentially to that of landlord for two of the restaurants (and occasional file clerk and kibitzer at one of the locations).

3. And if she wanted to help out as well, well that was just fine too. No doubt, she enjoyed being able to make a contribution, and she does so as much as she can. But she is clearly not saddled with the responsibilities of running the restaurant, and indeed has no right to insist on having the restaurants run in any particular manner. Hers is the persuasive voice of matriarch, not owner or operator.

as the *family's* homestead, to which she *and* the boys, as a family unit, succeeded after her husband, their father, Philip, died. Would not the continued operation of the "family business" on the property in question qualify it as a business homestead? *Cf. Woodward v. Sanger Bros.*, 246 F. 777 (5th Cir.1917).

▮ In Texas, the homestead is intended for the benefit of the family. *Woods v. Alvarado*, 118 Tex. 586, 19 S.W.2d 35 (1929). The Texas Constitution permits a single adult, as well, to claim a homestead. Tex. Const., art. XVI, § 51 (Vernon 1992). The question suggested by the facts of this case, then, is whether the homestead here is the Vera Finkel homestead (single adult), or the Finkel family homestead (family unit). If the latter, then the operation of the "family business" on the property in question could qualify it for business homestead. We thus must determine whether there is a "family unit" under these facts that consists of Vera Finkel and both her sons. The answer to this question lies in whether there was a family unit as of the filing of the bankruptcy which included both the sons.

▮ It is well settled in Texas that the definition of "family," as applied in the exemption statutes, has three requirements: (1) the family relation is one of status, (2) the head of the family must be legally or morally obligated to support at least one other family member, and (3) there must be a corresponding dependence on the supporting member. *See Roco v. Green*, 50 Tex. 483 (1878); *Henry S. Miller v. Shoaf*, 434 S.W.2d 243 at 244 (Tex.Civ. App.1968, writ ref'd n.r.e.). This requisite familial relationship may exist even between adult children and their parents. *See Matter of Hill*, 972 F.2d 116, 120 (5th Cir.1992) (single woman was head of house-

hold where her adult daughter and minor granddaughter were both living with her and were dependent upon her); *see Woods v. Alvarado*, 19 S.W.2d 35 (Tex.1929) (where two minor children lived with father after divorce, father's homestead was not destroyed when children grew up and left home).

In *Hill*, the Fifth Circuit found that a debtor's adult daughter and minor granddaughter were sufficiently dependent upon her for financial and emotional support, and that she did in fact support them, to satisfy the three requirements for finding the existence of a "family" relationship.[4]

In this case, Vera Finkel stated that she is not legally obligated to support anyone and that she in fact does not do so. Debtor's 50 year old son, Ron, does live with her; however, Ron moved into his mother's house *after* she filed bankruptcy. In addition, Debtor testified that Ron is not financially or legally dependent on her. Although Ron looks after his mother's financial affairs, he does not support her in any way. Therefore, this relationship does not meet the requirements of "family" to qualify Vera Finkel as the head of the family which operates GFAF—at least not within the meaning of the term as applied in the homestead context.

▮ Additionally, Ron is not in any way involved in the operation or ownership of the corporation under which Debtor claims a business homestead exemption. Therefore, even if Ron were dependent upon her, the family unit thereby formed is not running the restaurant operation. Larry Finkel runs the restaurant, and is clearly *not* dependent on his mother. He does not live with his mother. He has his own family, his own wife and children, and his own business—GFAF, doing business as Finkel's Restaurants.[5]

---

4. The case arose in the more traditional context for this issue—a rural homestead, where a single adult is entitled to 100 acres but a family unit is entitled to 200 acres. *Id.*

5. An interesting question suggests itself here, but the case law supplies an immediate answer. What if Vera were dependent on *her son?* Would that establish the bond necessary? The

case law says no, for it is the *head* of the family who must claim the property as the homestead for the family, and the head of the family is the one who, under the test, is obligated to *furnish* the support (moral or financial), not *receive* it. *See Roco v. Green*, 50 Tex. 483 (1878); *Henry S. Miller v. Shoaf*, 434 S.W.2d 243 at 244 (Tex.Civ. App.—Eastland 1968, writ ref'd n.r.e.).

In *Woods v. Alvarado*, the Texas Supreme Court established the general rule that, where the head of a family is entitled to a homestead exemption, and thereafter, either by death or dispersion of its members, he ceases to have a family, the homestead will remain exempt as long as the surviving constituents of the family continue to use and occupy the property as homestead. *Woods v. Alvarado*, 19 S.W.2d at 40. This rule followed from the court's conclusion that the homestead is an estate in land created not only for the protection of the family as a whole, but for units thereof. This estate can be divested only by alienation or abandonment, not by the dissolution of the family unit. *Woods v. Alvarado*, 19 S.W.2d at 38.

*Woods* involved a *residential* homestead. All that the father needed to do in order to continue to "use and occupy" the homestead was to live there. *Id.;*[6] *see In re Mitchell*, 132 B.R. 553, 568 (Bankr. W.D.Tex.1991). To use and occupy a business homestead, by contrast, one must conduct one's business or calling there. As has been amply explained earlier, Vera Finkel does not have a business or calling, much less is she *continuing to conduct* a business or calling at the property in this case. Under the *Woods* holding, therefore, Vera Finkel is *not* entitled to continue to claim this homestead, even if, at one time, Philip Finkel, as head of the Finkel family, used this property as his business homestead, for she has abandoned its use as a business. *See Federal Petroleum Co. v. Pittman*, 65 S.W.2d 359, 361 (Tex.Civ. App.—Eastland 1933, writ ref'd); *White v. Yates*, 85 S.W. 46, 48 (Tex.Civ.App.1905, no writ); *Evans v. Pace*, 21 Tex.Civ.App. 368, 51 S.W. 1094, 1095 (1899, no writ). Her

son Larry continues to use the property for the business purpose, but he does not have an ownership in the property and he is no longer part of Vera Finkel's family.

In any event, Philip Finkel did not establish a business homestead with respect to this property (assuming one was established) until *after* his sons reached majority and had established separate family units from their parents. Therefore, the exemption applied to Philip and Vera Finkel, separately, and did not extend to their sons. The family unit in which the business homestead exemption inhered was Philip and Vera Finkel. After Philip Finkel died, Vera could only claim whatever business homestead she might have by continuing the business in her own right, which, as we have earlier observed, she elected not to do. Thus, she cannot claim to be the survivor of a "family unit" consisting of Philip *and* the boys, with respect to this claimed business homestead. She is only the survivor of Philip, with respect to this property.

As there is no family unit here consisting of Vera and her sons, the most Vera Finkel can claim is her interest as a single adult. This property is not the business homestead of "the Finkel family."[7]

## IV. Doing business in a corporate form and its impact on claiming a business homestead

Vera Finkel finally argues that the Fifth Circuit's recent decision in *In re John Taylor Co.* supports her entitlement to the business homestead exemption. That case held that an individual may lease property claimed to be business homestead to a corporation owned and operated by the individ-

---

**6.** In *Woods*, the debtor had two minor children at the time of his divorce from his spouse. Although the children were awarded to his wife, they continued to reside with him. After some time, his children reached majority and moved out of the house. Debtor thereafter claimed a family rural homestead exemption (200 acres) on the property. The court held that Woods was entitled to the full 200 acre homestead exemption because this exemption survived the subsequent dissolution of his family unit. The exemption was established while his children resided with him and continued after they left

his house because he continued to use and occupy it as a homestead. *Id.*

**7.** Of course, it is perfectly sensible to speak socially of "the Finkel family." But in the legal sense, there are at least two, and more likely, three families here—Vera, a single adult; Larry and his wife and children; and Ron, a single adult. Merely being related and willing to go to bat for one another is part of being a family in the social sense. It does not, however, without more, create a family in the legal sense under discussion here.

ual, and still hold a right to the exemption. The court observed that the claimant wholly owned the corporation and continued to run it as her business, and the mere fact that the debtor claiming the exemption elected to conduct his or her business in the corporate form would not deprive the debtor of the right to claim that the property was being used to conduct the business or calling of the debtor—so long as the debtor had not also conveyed the property to the corporation as well. *In re John Taylor Co.*, 935 F.2d 75, 77 (5th Cir.1991).

Nothing in *John Taylor* affects the outcome of this case. Not addressed in that decision was whether the debtor there was or was not in fact operating the business on the premises as of the bankruptcy filing. In fact, the case was remanded to the trial court for further proceedings to determine whether the debtor was otherwise entitled to the claimed exemption. *Id.*

The legal principle announced in *John Taylor* is simply not implicated in this case. No one seriously questions that merely leasing the property here in question to the corporation which runs the restaurant will not of itself disqualify the property for the business homestead exemption. But the *sine qua non* is that the corporation leasing the property in fact be the form through which the debtor in question is conducting a business or calling. *Id.* That factual question was not presented in *John Taylor*, presumably because those facts were not before the circuit court. The same question *is* presented under our facts, and the answer is clearly in the negative— Vera Finkel is not conducting any business or calling at all, much less a business or calling on the premises of this property, and still less a business in the corporate format. The restaurant is her son's business, not hers.

## CONCLUSION

The court finds that Vera Finkel's activities are not sufficient to support her claim to be conducting a business or calling on the premises here in question. Furthermore, after she inherited her husband's interest in the property (along with whatev-

er business homestead he might have established in the property), she removed herself from the business operations of GFAF, abandoning any possible exemption she might otherwise have obtained from her late husband. In addition, there is no Vera Finkel family unit extending to include the son who operates the business because the exemption never applied to him while he was within the family unit, and in any event he is clearly the head of his own family unit. For all the foregoing reasons, Vera Finkel may not claim this property as her business homestead.

An order will be entered consistent with this decision.